MARGARET M. LAZARUS, complainant-respondent,

*v.*

HOME BUILDING AND LOAN ASSOCIATION, ARTHUR J. HER-
RICK, MATTHEW W. C. RYAN and JOHN T. CADEN,
defendants-appellants.

[Submitted October term, 1942. Decided May 13th, 1942.]

*Mr. Mark A. Sullivan,* for the appellants.

*Mr. Alfred Brenner,* for the respondent.

The opinion of the court was delivered by

PERSKIE, J.

The challenged decree, setting aside the election of the individually named trustees to liquidate defendant building and loan association and ordering a new election to be held under the supervision of a special master, presents three questions for decision:

1. Did the Court of Chancery have jurisdiction to enter the challenged decree?

2. Did the Vice-Chancellor err in determining the issue on *ex parte* affidavits?

3. Did the Vice-Chancellor err in determining that the proxies voted were illegal because they were not properly witnessed?

The litigation commenced. February 9th, 1942, with the filing of a bill by complainant who is the owner of 30 shares in the defendant association and which shares had, a week before the filing of the bill, a withdrawal value of $3,445.85. The bill was filed for complainant's own benefit and for the benefit of "such other shareholders as shall come in   *   *   * and contribute to the expenses of [the] suit." Subsequently some 121 shareholders, holding approximately 1,244 shares in defendant association, filed an informal petition, on February 24th, 1942, praying that an order be made joining them as parties complainants and that it be decreed that they be entitled to the same relief prayed for by the complainant in her bill of complaint. The record does not disclose the disposition made of this petition.

The bill which was supported by affidavits averred, in substance, that a meeting of the shareholders of the association was held, apparently pursuant to legal notice, on January 12th, 1942, at which meeting the directors recommended that the association be dissolved and liquidated. A shareholders' committee was appointed to investigate and report at a subsequent meeting the date for which was "fixed for February 2d, 1942." Although no further formal notice of the meeting of February 2d, 1942, was given, that meeting was held and lasted from 9:30 P. M., until 6:00 A. M. It will serve no useful purpose to detail all of the charges in the bill concerning the disorderly manner in which the meeting was conducted.

It shall suffice if we observe that the shareholders' committee reported that their preliminary investigation revealed that there were "serious irregularities" on the part of the "officers" of the association. The committee declined to reveal the alleged irregularities but pledged themselves to reveal them and furnish proof in support of them, to the trustees, to be elected, for their further investigation. The shareholders' committee, however, recommended that the affairs of the association were in "such condition," without

disclosing the condition, as to warrant the dissolution and liquidation of the association. A motion was made that the association be dissolved and liquidated. The chairman named three tellers. Their selection was greeted with "jeers" and resulted in "tremendous disorder." The cry was raised that the chairman's selectees were dictated by local politicians who were supporting those who were in control of the management of the association, that the meeting was "stacked" for the "benefit of the management" who allegedly had "something to conceal," and that no candidate selected by the shareholders from the floor would receive an "honest" count. The chairman was adamant. It was not until he "realized" that a "riot" might ensue, that he acceded to the demands of the protesting shareholders, namely, that three of their number be named to served as tellers with three of the nominees of the management. The vote to dissolve and liquidate the association was unanimous.

The shareholders then nominated three trustees. While no formal nominations were apparently made on behalf of the management, private ballot containing the names of three men offered by the management was distributed. After everyone present had voted, the chairman directed one of the tellers to deposit in the ballot box all the ballots cast in behalf of absent shareholders for whom the management allegedly held proxies. It then appeared that the ballots of many of the absent shareholders were witnessed by officers of the association who never had seen the absent shareholders sign the proxies. Although the shareholders' group had made no objection to the form of the proxies when they were used on the vote of the question of dissolving and liquidating the association, nevertheless, they strenuously objected to the voting of these ballots on the election of the trustees. The ground of objection was that the proxies were illegal because "the by-laws of the association" require the proxies to be signed in the presence of a witness. (Parenthetically, it is well here to state that the record does not contain a copy of the by-laws.) Discussion on this question lasted until 6:00 A. M., when the shareholders realizing that further effort on their part to conduct an unbiased election would be futile "with-

drew" from the meeting place. Immediately thereafter a vote was taken, the proxies in question were deposited in the ballot box, and the nominees of the management were declared to have been elected trustees by a vote of 272 to 233.

The bill and supporting affidavits, after reciting substantially these facts, prayed, among other things, that the election be declared null and void; that the trustees be enjoined from proceeding with the dissolution and liquidation; that a new vote for dissolution and a new election of trustees be had; that the rights of the parties be defined; that the business of the association be regularly conducted pending a valid vote and election; and that a master be appointed to supervise an election.

Immediately upon the filing of the aforesaid bill and supporting affidavits, an order, without *ad interim* restraint, was granted, returnable on February 24th, 1942, directing the defendants to show cause why the relief prayed for should not be granted. No subpœnas were ever issued and no answers were filed. Affidavits on behalf of the management were, however, filed. These affidavits averred, in substance, that the meeting in question "never got out of hand," and that it "was conducted to an orderly conclusion by the presiding officer." In addition, the association procured, on February 21st, 1942, a certificate from the Commissioner of Banking and Insurance certifying, among other things, the election of the nominees of the management as trustees, and directing that the association "be dissolved and its business liquidated by said trustees, pursuant to the statute in such case made and provided."

Thereafter, without a final hearing based on oral proofs but rather on *ex parte* affidavits of the respective parties, the learned Vice-Chancellor granted the relief prayed for. Hence this appeal.

We thus come to the consideration and determination of the three posed questions.

First: Did Chancery have jurisdiction to enter the challenged decree? Our answer is that Chancery did have jurisdiction but we are not able, on the record submitted—as hereafter pointed out—to determine whether the applicable statu-

tory provisions were followed. We bottom our answer upon the grounds that, as stated by the learned Vice-Chancellor, "trustees in liquidation are neither directors nor officers but are functionaries chosen for a particular purpose," since they are "almost identical in their functions with receivers who are, \* \* \* always subject to the court," that because of the "special nature" of the trustees their subordination to Chancery is recognized by *N. J. S. A. 17:12-88* and by reason of our affirmance in *Lerner* v. *Star Building and Loan Association, 127 N. J. Eq. 355; 13 Atl. Rep. (2d) 231,* wherein Vice-Chancellor Stein said (at *pp. 357, 358*), "it is not doubted that this [Chancery] court has the power to order action upon the resolution adopted by the board of directors to supervise, through a special master of the court, a meeting for that purpose." We think additionally that Chancery had the right to act because of its inherent jurisdiction over trusts. From the earliest times to the present day Chancery was given and has maintained jurisdiction and control over the administration of trusts and the conduct of trustees. *Cf., Smith* v. *Washington Casualty Insurance Co., 110 N. J. Eq. 122, 131; 159 Atl. Rep. 510; Guenther* v. *Flink, 132 N. J. Eq. 164, 169; 26 Atl. Rep. (2d) 186; In re Interstate Building and Loan Association, 126 N. J. Eq. 469, 471; 10 Atl. Rep. (2d) 172; Morawetz on Corporations (2d ed.) §§ 543, 543a; Taylor on Private Corporations (5th ed.) § 581; Pom. Eq. Jur. (4th ed.) §§ 1086, 1087, 1088,* and *3 Cook on Corporations (8th ed.) 2105.* The jurisdiction of Chancery must, however, be exercised properly. *Cf., Grobholz* v. *Merdel Mortgage Investment Co., 115 N. J. Eq. 411, 415; 170 Atl. Rep. 815.* For if the association is solvent then the provisions of *N. J. S. A. 17:12-81* to *17:12-94* control its voluntary dissolution and liquidation. Under these provisions, the vote as to whether the association should be dissolved and liquidated and the vote on the election of the trustees may be conducted by the shareholders without the aid of Chancery or the vote on either one or both matters may be conducted under the supervision of a special master appointed by Chancery. *Cf., Lerner* v. *Star Building and Loan Association, supra.* If, however, the association

is insolvent then the provisions of *N. J. S. A. 17:12-64* to *17:12-80* control. Under these provisions, the shareholders in no way control the liquidation of the association. Chancery takes hold. If the shareholders have elected trustees to liquidate their association before Chancery has taken hold, Chancery forthwith removes them. Chancery then appoints a receiver who neither by his official participation in the affairs of the insolvent association nor by personal affiliation with the individual directors would be embarrassed in the due administration of his duties. *Fitzgerald* v. *State Mutual Building and Loan Association, 74 N. J. Eq. 440; 69 Atl. Rep. 564.* But as indicated, our difficulty is that there is nothing in the record to indicate whether the association is solvent or insolvent. That fact should be made clear. For then and then only can it be determined whether the proper statutory provisions were followed.

Assuming, however, as appellants do, that the meeting in question was held under the provisions of *N. J. S. A. 17:12-81, et seq.,* nonetheless, we are not persuaded by the argument that the trustees ·in liquidation may be removed only upon the application of the Commissioner of Banking and Insurance. The argument is not sound. *N. J. S. A. 17:12-82* obviously refers only to trustees validly elected and not a case where, as here, the validity of the election of the trustees is in issue.

Nor is *N. J. S. A. 14:10-16* controlling. That section of our General Corporation Act refers to directors and officers and not to trustees. That provision has for its origin an act passed December 8th, 1825 (*Harr. Comp. 112*) and entitled "An act to prevent fraudulent elections by incorporated companies and to facilitate proceedings against them." The provisions thereof were later carried into section 42 of our Corporation Act (Revision of 1896), *P. L. 1896 p. 291,* and embodied in *N. J. S. A. 14:10-16.* The history of that act was traced by Mr. Justice Magie in *In re Bethany Church, 60 N. J. Law 88; 26 Atl. Rep. 701.* In that case it was pointed out that the act was intended to apply only to elections held under the Corporation Act and not, as there, to "trustees" elected under a statute relating to

religious corporations. See *Robak* v. *Polish, &c., Association, 95 N. J. Law 70, 71; 111 Atl. Rep. 599,* and *In re Polish American Building and Loan Association, 123 N. J. Law 396; 8 Atl. Rep. (2d) 832.* And clearly there is no merit to the passing reference that our *Quo Warranto* Act (*N. J. S. A. 2:84-1*) is controlling. This is not a contest for title to office.

Second: Did the Vice-Chancellor err in determining the issues on *ex parte* affidavits? We think so.

As has already been observed, the cause was commenced by bill, no subpœnas were ever issued, no answers were filed, and no final hearing was conducted. The Vice-Chancellor reached his conclusions and advised the challenged decree upon the *ex parte* affidavits submitted in support of and in opposition to the granting of the order to show cause. No oral testimony was taken. The affidavits were in sharp contrast. Those offered on behalf of the complainant charged that the meeting was not properly conducted, while those offered for the association averred that the meeting was orderly and "never got out of hand." It is well settled that a summary proceeding such as was employed in this matter is improper unless authorized by statute. *Cf., Grobholz* v. *Merdel Mortgage Investment Co., supra* (at *p. 423*). No such applicable statutory authority is made to appear. And when, as here, there is a sharp conflict in the facts, it is neither the "custom" nor "usage" summarily to ascertain where the truth lies on the return of a rule to show cause not involving *ad interim* restraint. See Chancery Rules (XXXIII, Injunctions) 210, *et seq.* The cause should be brought on in the regularly prescribed manner for trial and a full and fair hearing should be had. *Cf., Test* v. *Test, 131 N. J. Eq. 197, 201; 24 Atl. Rep. (2d) 226.* Such a hearing is particularly necessary here for the court should know whether the association is solvent or insolvent.

Third: Did the Vice-Chancellor err in determining that the proxies voted at the meeting were illegal because they were not properly witnessed? We think so. No attack is made upon the genuineness and authenticity of the signatures on the proxies. We therefore think that the proxies were

not void even if we assume they were improperly witnessed or not witnessed at all. Their validity here does not depend upon *N. J. S. A. 17:12-37,* but rather upon the provisions of *N. J. S. A. 17:12-31* and *17:12-32* which clearly permit voting by proxy and prescribe no form that the proxy must take. Hence no particular form need be followed. *Taylor v. Griswold, 14 N. J. Law 222; In re St. Lawrence Steamboat Co., 44 N. J. Law 529, 534; Hankins v. Newell, 75 N. J. Law 26, 28; 66 Atl. Rep. 929.* The proxies involved were in fact used—as we have observed—without challenge on the vote as to the tellers. Moreover, neither the constitution nor the by-laws of the association are before us and we cannot pass upon their terms. Regardless of their terms, however, they cannot, in the circumstances of the case at bar, legally curtail the unfettered right to vote by proxy given by the aforestated applicable statutory provisions.

The decree is reversed, and the cause is remanded to the Court of Chancery with direction that the necessary amendments be permitted so that the cause may be treated consistently with the views herein expressed. Costs are to abide the event.

*For affirmance*—HEHER, RAFFERTY, THOMPSON, JJ. 3.

*For reversal*—THE CHIEF-JUSTICE, PARKER, CASE, BODINE, DONGES, PERSKIE, PORTER, DEAR, WELLS, HAGUE, JJ. 10.